# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

ANESTACIO TENEYUQUE,

Defendant-Appellant.

UNPUBLISHED
February 9, 2016

No. 323224
Saginaw Circuit Court
LC No. 13-039188-FH

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

JULIAN VINCENT TENEYUQUE

Defendant-Appellant.

No. 323232
Saginaw Circuit Court
LC No. 13-039187-FH

Before: BOONSTRA, P.J., and K. F. KELLY and MURRAY, JJ.

PER CURIAM.

Defendants in these consolidated[1] cases are brothers who were tried together on charges arising from a string of home invasions committed in February and March of 2013. A jury convicted Anestacio Teneyuque (Docket No. 323224) of two counts of receiving and concealing stolen goods valued between $1,000 and $20,000, MCL 750.535(3)(a), two counts of second-degree home invasion, MCL 750.110a(3), and two counts of conspiracy to commit second-degree home invasion, MCL 750.110a(3), MCL 750.157a. The same jury convicted Julian Teneyuque (Docket No. 323232) of four counts of second-degree home invasion, MCL 750.110a(3), four counts of conspiracy to commit second-degree home invasion, MCL 750.110a(3), MCL 750.157a, one count each of first-degree home invasion,

---

[1] *People v Teneyuque*, unpublished order of the Court of Appeals, issued August 27, 2014 (Docket Nos. 323232, 323224).

MCL 750.110a(2), and conspiracy to commit first-degree home invasion, MCL 750.110a(2), MCL 750.157a, three counts of receiving and concealing stolen goods valued between $1,000 and $20,000, MCL 750.535(3)(a), eleven counts of possession of a firearm while committing or attempting to commit a felony (felony-firearm), MCL 750.227b, five counts of felon in possession of a firearm, MCL 750.224f, and five counts of receiving and concealing stolen firearms, MCL 750.535b. Defendants appeal by right. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

The charges against defendants arise from six home invasions in the City of Saginaw or Saginaw Township that occurred between February 25, 2013 and March 23, 2013:

February 25, 2013 – 2667 Moonglow Dr.

March 11, 2013 – 1060 Wilson St.

March 11, 2013 – 3017 West Genesee

March 16, 2013 – 730 Plymouth Rd.

March 18, 2013 – 3349 West Wintergreen

March 23, 2013 – 5933 Birchcrest Dr.

The victimized homeowners testified at defendants' trial that the home invaders made away with jewelry, guns, tools, and an assortment of electronics—primarily televisions, cameras, gaming systems, and laptop computers.

Employees of Thomas T Jewelers, Columbus Coin Exchange, and the now-defunct International Gold and Silver testified that, on or immediately after the dates on which the home invasions occurred, they purchased jewelry from codefendant Julian Teneyuque, his sister Erica Teneyuque, their cousin Alejandro "Alex" Teneyuque, or Julian's then-girlfriend, Jessica Long.[2] Veronica Goergen, a 21-year employee of Thomas T. Jewelers, testified that she paid Erica, on February 26, 2013, the day after the first home invasion, $200 for a 14-carat gold men's ring with a half-carat of small diamonds, and a 10-carat gold ring with 15 small diamonds, and on March 11, 2013, the date of the second home invasion, $743 for jewelry that included several 9-carat gold pieces. Goergen testified that anything less than 10-carat gold is not considered gold in the United States, but that 9-carat gold is common in England. One of the victims of the second home invasion testified that among the items stolen from his home on March 11, 2013 were several pieces of 9-carat gold jewelry purchased in England.

_____

[2] Erica Teneyuque, Alex Teneyuque, and Jessica Long were prosecuted separately. In order to avoid confusion, we will henceforth refer to the Teneyuques by their first names.

Michelle Kerr of Columbus Coin Exchange testified that on March 12, 2013, the day after the second home invasion, Julian came into her store accompanied by a woman and sold Kerr a 14-carat gold fashion ring, a 10-carat gold fashion ring, and a tennis bracelet. Victoria Gamez of the now-closed International Gold and Silver testified that, on March 16, 2013, the day of the fourth home invasion, she paid Erica approximately $2,650 in two transactions for yellow gold jewelry. Erica was accompanied by Julian during the first transaction and Alex during the second. Both transactions were recorded on security video that was played for the jury. Finally, on March 19, 2013, the day after the fifth home invasion, Gamez purchased jewelry from Long for $650.

The string of home invasions ended with the March 23, 2013 home invasion at 5933 Birchcrest Drive. Kylie Anderson lived at the address and testified that, on the morning of the home invasion, she and her aunt left separately around 10:15 a.m. Anderson said that she returned home no later than 11:45 a.m., and found that someone had entered the garage through a window, had entered the house through a door that led from the garage into the kitchen, and had stolen several items, including a gold ring with a Mercedes Benz symbol, two laptop computers, a PlayStation 3, and a digital camera. Cameron Lynn, who lived across the street from Anderson, testified that, after she learned of the home invasion, she told Anderson that she saw an unfamiliar blue and yellow car drive slowly past the house at least three times between 8:00 a.m. and 10:30 a.m. that morning. This information was conveyed to the police, who shortly thereafter stopped a car matching Lynn's description, which Lynn later identified as the car she had seen.

The occupants of the car were Anestacio, Erica, Alex, and Dale Carlton, all four of whom were arrested. Inside the car, police found jewelry in a cup holder on the console, and a gold ring with a Mercedes Benz symbol in a plastic bag "stuffed in the rear seat between the backrest and the seat itself." Search warrants executed at the residences of Alex and Erica uncovered items stolen during the Moonglow, Genesee, and Wilson home invasions. A search warrant executed at Long's residence on the evening of March 25, 2013 uncovered items taken during the Plymouth, Wilson, Genesee, and Wintergreen home invasions.

At trial, Long was the prosecution's key witness. At the time of the trial, she was in the Bay County jail awaiting sentencing on charges of receiving and concealing stolen goods that arose from her participation in the home invasions. Long testified that about two weeks after she and Julian had resumed their prior relationship in early March of 2013, Julian brought some items into her house that she thought he could not have afforded to purchase with the income he earned from his job at a car wash, and which Julian told her he had gotten from people's houses. She said that Julian used her van to bring such property to her house five or six times, each time accompanied either by Anestacio or Alex, and that Julian split the property with whomever was with him. She remembered Anestacio bringing a red Wii game system to the house, but could not remember any of the other items he brought. A red Wii was taken during the home invasion of 3349 West Wintergreen. She remembered Julian explaining that they chose a target based on who was not home or who was just leaving home, but could not recall whether Anestacio was present during the explanation.

Long testified that she was arrested on March 25, 2013, when a search warrant executed at her house uncovered goods stolen during the Plymouth, Wilson, Genesee, and Wintergreen

home invasion. She acknowledged prior, unrelated convictions for retail fraud and larceny in a building, and said that she had purchased, used, and sold property in the instant case that she knew or thought to be stolen. She admitted that she was outside International Gold and Silver while Julian, Erica, and Alex were inside selling jewelry, that she had sold jewelry to International Gold and Silver at Julian's request, and that she had accompanied Erica and Julian when they sold jewelry to Thomas T. Jewelers. She also admitted that she contacted her stepfather and asked if he was interested in buying hunting rifles that Julian had brought to her house, which rifles had been taken during the home invasion on Plymouth Rd. Thomas Zazo, the brother of Long's stepfather, testified that he purchased two of the guns from Julian, but could not identify Julian at trial.

Long denied that her testimony was motivated by vengeance. She said that, after consulting with her lawyer, she decided to tell the police what she knew, primarily in order to clear her name. Long said that she was not promised anything in return for her testimony and that, at the time she spoke to police, she had hoped, rather than expected, to receive some sort of consideration at sentencing.

James Rich, a police officer with the Saginaw Township Police Department and a certified evidence technician, testified that he dusted the garage window frame, glass, screen, and window crank for prints, as well as some of the surfaces inside 5933 Birchcrest Dr. and lifted a number of prints from two televisions left in the house. Kenneth Binder testified as an expert in fingerprint and palm print analysis and comparison that he was able to identify only one latent print, that it was a palm print taken from the garage window, and that it belonged to Alex.

At the close of the prosecution's case-in-chief, both codefendants moved for a directed verdict. The trial court denied both motions, acknowledging that the credibility of the witnesses was a matter for the jury to determine, and concluding that Long's testimony tied the evidence together and provided sufficient reason to submit the matter to the jury. The jury convicted Julian of all charges, and convicted Anestacio of the charges related to 3349 West Wintergreen and 5933 Birchcrest Dr., but acquitted him of the charges related to 1060 Wilson St.

## II. DOCKET NO. 323224 (ANESTACIO)

### A. DIRECTED VERDICT

Anestacio argues first that the trial court erred in denying his motion for a directed verdict, because no direct evidence established that he had entered or conspired to enter any of the houses where the home invasions had occurred. We disagree.

When reviewing a trial court's decision on a motion for a directed verdict, we review the record de novo to determine whether the evidence presented by the prosecution, viewed in the light most favorable to the prosecution, could persuade a rational trier of fact that the essential elements of the crime charged were proved beyond a reasonable doubt. *People v Gillis*, 474 Mich 105, 113; 712 NW2d 419 (2006); *People v Lemmon*, 456 Mich 625, 634; 576 NW2d 129 (1998).

-4-

Anestacio was convicted of two counts of violating MCL 750.110a(3), which states:

A person who breaks and enters a dwelling with intent to commit a felony, larceny, or assault in the dwelling, a person who enters a dwelling without permission with intent to commit a felony, larceny, or assault in the dwelling, or a person who breaks and enters a dwelling or enters a dwelling without permission and, at any time while he or she is entering, present in, or exiting the dwelling, commits a felony, larceny, or assault is guilty of home invasion in the second degree.

He was also convicted of conspiring with one or more persons to commit second-degree home invasion. MCL 750.110a(3); MCL 750.157a. Conspiracy is a specific-intent crime that "requires both the intent to combine with others and the intent to accomplish the illegal objective." *People v Mass*, 464 Mich 615, 629; 628 NW2d 540 (2001).

Anestacio correctly observes that plaintiff presented no direct evidence placing him inside the burglarized homes. However, the elements of a crime may be established by circumstantial evidence. *People v Schultz*, 246 Mich App 695, 702; 635 NW2d 491 (2001). In the instant case, Long testified that Julian dropped things off at her house that he could not have afforded with the income he received from the car wash, and that Anestacio was with him on three such occasions. She remembered testifying at the preliminary examination that Anestacio said "I got this," implying that he took one of the pieces of property, and she recalled that one of the items Anestacio brought to her house was a red Wii. A red Wii was taken during the home invasion of 3349 West Wintergreen. Viewed in the light most favorable to the prosecution, *Gillis*, 474 Mich at 113; *Lemmon*, 456 Mich at 634, a rational juror could infer from Long's testimony that Anestacio conspired with Julian to enter the Wintergreen home, entered the Wintergreen home, and stole a red Wii. In addition, jurors could also conclude from Nicki White's testimony that Anestacio tried to sell her a laptop and a PlayStation that he had earlier stolen from 5933 Birchcrest Dr. Furthermore, a rational juror could conclude from White's testimony and Binder's identification of Alex's palm print at the scene that Anestacio and Alex conspired to commit, and did commit, the Birchcrest home invasion. The credibility of Long and White was the pivotal issue, and this was an issue for the jury to decide. *People v Peña*, 224 Mich App 650, 659; 569 NW2d 871 (1997). If the jurors believed the witnesses and the reasonable inferences drawn therefrom, *Schultz*, 246 Mich App at 702, along with other evidence presented at trial, this was sufficient to establish the elements of home invasion and conspiracy to commit home invasion beyond a reasonable doubt. Therefore, the trial did not err in denying Anestacio's motion for a directed verdict.

## B. PROSECUTORIAL ERROR

Anestacio next contends that the prosecution committed reversible error[3] by asking Long to give her opinion on defendants' guilt with regard to the receiving and concealing stolen goods charges. We disagree.

Defense counsel objected to the prosecution's question after it had been answered; although the trial court sustained the objection, counsel did not request that the answer be stricken; counsel therefore failed to preserve this issue for appellate review. MRE 103(a)(1); see also *People v Jones*, 468 Mich 345, 354-355; 662 NW2d 376 (2003) ("[T]o be timely, an objection should be interposed between the question and the answer . . . to give the trial court an opportunity to correct the error."). Therefore, our review is limited to ascertaining whether there was plain error that affected substantial rights. *People v Brown*, 279 Mich App 116, 134; 755 NW2d 664 (2008). "To avoid forfeiture of an unpreserved, nonconstitutional plain error, the defendant bears the burden of establishing that: (1) error occurred, (2) the error was plain, i.e., clear or obvious, and (3) the plain error affected substantial rights." *Jones*, 468 Mich at 355. Reversal is warranted only when plain error resulted in the conviction of an innocent person, or seriously affected the fairness, integrity, or public reputation of the proceedings. *People v Unger*, 278 Mich App 210, 235; 749 NW2d 272 (2008).

Anestacio bases his claim of error on the following exchange:

> *Prosecution*: So, obviously, during that month of March 2013 it became obvious to you that these guys were bringing in property to your house that were [sic] from other people, correct?
>
> *Long*: Yes.

It is impermissible for a witness to express her opinion regarding a defendant's guilt or innocence. *People v Fomby*, 300 Mich App 46, 53; 831 NW2d 887 (2013). The fact that the trial court sustained defense counsel's objection to the question arguably establishes that the prosecution committed plain error by asking Long to give her opinion on an ultimate issue about which she had no personal knowledge. See MRE 701 (stating that nonexpert testimony in the form of opinions or inferences is limited to opinions and inferences rationally based on the witness's perception). The question, therefore, is whether this plain error affected Anestacio's substantial rights. *Jones*, 468 Mich at 355. "To establish that a plain error affected substantial rights, there must be a showing of prejudice, i.e., that the error affected the outcome of the lower-court proceedings." *Id*. at 356. Reversal is warranted only when plain error resulted in the

---

[3] Anestacio categorizes his claim as one of "prosecutorial misconduct," a categorization to which plaintiff takes issue, preferring the term "prosecutorial error." As we have previously stated that "prosecutorial misconduct" is more appropriate for conduct that is illegal or violates the rules of professional conduct, *People v Cooper*, 309 Mich App 74, 87-88; 867 NW2d 452 (2015), we will refer to Anestacio's claim as one of "prosecutorial error."

conviction of an innocent person, or seriously affected the fairness, integrity, or public reputation of the proceedings. *Unger*, 278 Mich App at 235.

Our review of the record leads us to conclude that Anestacio has failed to meet his burden of establishing that the prosecution's error affected the outcome of the proceedings. *Jones*, 468 Mich at 356. The trial court sustained defense counsel's objection to the question and, although defense counsel did not ask the trial court to strike Long's answer, the record does not suggest that the jury was unduly influenced by the exchange. At the start of the trial, the trial court informed the jurors that it was their job to determine the facts in the case and to determine how much they believe of what each witness said, and repeated these statements in its closing instructions to the jury. We presume that jurors follow the trial court's instructions. *People v Gayheart*, 285 Mich App 202, 210; 776 NW2d 330, (2009). In the absence of any evidence or argument to the contrary, it is reasonable to presume that the jurors in the instant case followed their instructions and decided for themselves whether the items Julian and Anestacio brought to Long's house were stolen.

Moreover, even if the trial court had stricken the testimony at issue, there was sufficient evidence from which a rational juror could reasonably infer that Anestacio received and concealed stolen goods. Long testified that Julian and Anestacio brought things to her house that she knew were not Julian's, and that among the items Anestacio brought to her house was a red Wii. Mary Lagalo testified that a red Wii was taken during the home invasion of her home at 3349 West Wintergreen. In addition, White testified that Anestacio tried to sell her a laptop and a PlayStation on the same morning that Anderson said her laptop and PlayStation were stolen from 5933 Birchcrest Dr. The testimony of Long, Lagalo, White, and Anderson, if believed by the jury, is sufficient to allow a rational trier of fact to infer beyond a reasonable doubt that Anestacio was guilty of receiving and concealing goods that were stolen. Consequently, there is no evidence to support the conclusion that the above-quoted exchange seriously affected the fairness, integrity, or public reputation of the proceedings or resulted in the conviction of any innocent person, *Unger*, 278 Mich App at 235.

## III. DOCKET NO. 323232 (JULIAN)

### A. PROSECUTORIAL ERROR

Julian first claims that he was denied a fair trial when the prosecution vouched for Long's credibility during closing argument and rebuttal. This issue is unpreserved because defense counsel did not object to the prosecution's comments and request a curative instruction. *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010). Therefore, our review is limited to determining whether there was plain error that affected Julian's substantial rights. *Brown*, 279 Mich App at 134. Reversal is warranted only when plain error resulted in the conviction of an innocent person, or seriously affected the fairness, integrity, or public reputation of the proceedings. *Unger*, 278 Mich App at 235.

The prosecution may not vouch for the credibility of a witness by implying or stating that it has some special knowledge that the witness is testifying truthfully. *People v Bahoda*, 448 Mich 261, 276; 531 NW2d 659 (1995); *People v Seals*, 285 Mich App 1, 22; 776 NW2d 314 (2009). However, a prosecutor may argue from the facts in evidence that a witness is worthy of

-7-

belief, *Seals*, 285 Mich App at 22, and that a witness should be believed. *People v Wise*, 134 Mich App 82, 104; 351 NW2d 255 (1984).

Julian bases his claim of error on the following comments made during the prosecution's closing and rebuttal arguments:

> Listening to her jail phone conversations it's pretty clear she was scared and wanted to get home to her kids. There is no vengeance in this case with regard to Jessica's testimony. And there hasn't been any motive to lie about either Julian or Anestacio. She came clean because she wanted to be home with her kids.

> Jessica's testimony is believable because she implicates herself. . . . Certainly if she was vengeful, or wanting to make things up, she could have embellished and really tried to nail them on the statements she overheard.

> Certainly if she was lying and out to get these people she would have embellished those statements and made them more effective in this case for her in her testimony. But that is why she is credible, because she testified to only what she could remember.

> . . . And did it sound on those phone calls that she was setting him up in any way? No, it doesn't. All those phone calls show is that she was afraid of being away from her kids and going to prison. And that she knew she wasn't responsible for these things. And that she was going to tell the truth to the police.

> But taking into account the jail phone calls, of how Jessica Long reacted when she heard her baby's voice, and listened to the charges that were on her account, you can—that leads you to believe that she decided to come clean.

> Her testimony with regard to the defendant's statements, Julian's statements of admitting that he was going into people's houses, and her testimony with regard to Anestacio's statement about when he was discussing the property or; I got this. Meaning he got it from one of the houses. That is credible based on everything you have heard in this case. That corroborates her.

We conclude that the prosecution did not imply that it had special knowledge that Long was testifying truthfully. *Bahoda*, 448 Mich at 276. The prosecution's statements answered defense counsel's theory that Long had an ulterior motive for testifying, and argued from the facts that Long was worthy of belief. *Seals*, 285 Mich App at 22. In his opening statement, Julian's counsel stated that Long and Julian had a stormy relationship, and that it was "payback time for her against Julian." During his cross-examination of Long, Julian's counsel asked questions implying that Long's relationship with Julian was strained around the time her house was searched. The first, fourth, and fifth above-quoted statements respond to defense counsel's argument and find support in the record of Long's trial testimony. In the second and third above-quoted statements, the prosecution suggests that Long may be believed because she testified to her own involvement and only to what she remembered. These statements also find support in the record: Long admitted prior convictions for retail fraud and larceny in a building, and that

-8-

she had purchased, used, and sold property in this case that she knew or thought was stolen, and she frequently admitted that she did not know or could not recall details from events that occurred in 2013. In the sixth statement, the prosecution merely invites the jury to find Long worthy of belief because her testimony regarding defendants' activities is corroborated by the testimony of other witnesses. Julian has not argued, and we do not find, that this statement misrepresents the record.

Based on the foregoing, we conclude that Julian's due process rights were not violated because the prosecution did not err by vouching for or bolstering Long's credibility. The prosecution argued that Long was worthy of belief, *Seals*, 285 Mich App at 22, and based its argument for her credibility on the testimonial and physical evidence admitted at trial, not on any personal knowledge or factors external to the trial. Because we find no prosecutorial error, we also find without merit Julian's claim that his trial counsel was ineffective for failing to object to the prosecution's statements. *Strickland v Washington*, 466 US 668, 688, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984); *People v Crews*, 299 Mich App 381, 401; 829 NW2d 898 (2013).

## B. IMPROPER LAY WITNESS OPINION TESTIMONY

Julian next argues that he was denied a fair trial by the admission of the lay opinion testimony of Adam Nothelfer, a police officer with the Saginaw Township Police Department, and that the officer's testimony invaded the jury's authority to interpret the evidence. We disagree. Because defense counsel did not object to the officer's testimony, this issue is unpreserved. *People v Metamora Water Serv, Inc*, 276 Mich App 376, 383; 741 NW2d 61 (2007). Therefore, our review is limited to determining whether there was plain error that affected Julian's substantial rights. *Brown*, 279 Mich App at 134. Reversal is warranted only when plain error resulted in the conviction of an innocent person, or seriously affected the fairness, integrity, or public reputation of the proceedings. *Unger*, 278 Mich App at 235.

Nothelfer testified as a lay witness that he observed "two different shoe patterns" at the Wilson Street home invasion, and concluded that they were from two separate shoe prints. He also testified that he saw "two different tread patterns" from the Plymouth Street home invasion, and he answered affirmatively when the prosecutor asked him if the evidence led him "to believe that there were two suspects involved in this." Several times during its closing argument, the prosecution repeatedly referred to the "two sets of footprints" at the scene of some of the home invasions. Julian contends that it was for the jury to determine how many sets of footprints were at the scenes of the home invasions, that Nothelfer's testimony was, therefore, inadmissible, and that the prosecution's reliance on the officer's testimony seriously affected the fairness, integrity, or public reputation of judicial proceedings such as to require reversal of Julian's convictions. We disagree.

A witnesses who is not testifying as an expert may testify in the form of opinion or inference if the witness' opinion and inferences are "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." MRE 701. Nothelfer was the evidence technician tasked with making castings of the shoe prints at two of the home invasions, and distinguishing between the known and unknown shoe prints. Consequently, his testimony about the number of unknown shoe prints or tread patterns at the scene of the two home invasions where he was evidence technician was

rationally based on his perception of the shoe print castings he made. Furthermore, Nothelfer's explanation of how shoe-print photographs admitted into evidence displayed different lug patterns on the bottom of the shoes was arguably helpful to a clear understanding of his testimony regarding the different sets of shoe prints. For these reasons, we find that Nothelfer's testimony that his castings revealed two sets of unknown shoe prints at two of the home invasions appears to satisfy the requirements of lay opinion testimony established by MRE 701.

Further, even if Nothelfer's extrapolation from the shoe-print evidence that two sets of shoe prints implied two suspects was an impermissible inference not rationally based on his perception, Julian fails to show how he was prejudiced by the testimony. First, the jury's verdict belies Julian's suggestion that the jury abandoned its role as fact finder and gave undue deference to the "personal opinion of an experienced police officer." The trial court properly instructed the jurors on their responsibility to determine the facts of the case, and we generally presume that the jury will follow the trial court's instructions. *Gayheart*, 285 Mich App at 210. Additionally, this presumption is confirmed by the fact that the jury acquitted one of the codefendants of the Wilson St. home invasion, one of the scenes about which Nothelfer testified.

Second, even if the trial court had excluded or stricken Nothelfer's testimony, the testimony of other witnesses indicated the existence of a conspiracy to commit home invasion. Long testified that Julian always brought goods to her house in the company of either Alex or Anestacio. Melissa Schoenmeyer testified that when she returned home around 8:05 a.m. after taking her children to school on February 25, 2013, she saw two men running out of her house, one of them carrying a large black case. Sondra Dinninger said that around the same time, she saw two men with backpacks walking behind the building where she worked, and one was carrying a large black case. Sergeant Sadowski, an officer with the Saginaw Township Police Department, testified that he and another officer traced two sets of tracks from Schoenmeyer's home on Moonglow, to the back of the building where Dinninger worked. Cameo Lynn testified that there were at least three people in the blue and yellow car she saw on the morning of the home invasion on Birchcrest. Thus, even without Nothelfer's testimony, there was ample evidence from which a rational factfinder could conclude that the prosecution had proved beyond a reasonable doubt the elements of conspiracy to commit home invasion.

There was no plain error in the admission of Nothelfer's testimony, *Brown*, 279 Mich App at 134, and even if there was, it cannot be shown to have seriously affected the fairness, integrity or public reputation of judicial proceedings, *Unger*, 278 Mich App at 235. Finally, because Nothelfer's testimony satisfied the evidentiary requirements for lay witness opinion testimony, trial counsel was not ineffective for failing to object to its admission. *Strickland*, 466 US at 688; *Crews*, 299 Mich App at 401.

Affirmed.

/s/ Mark T. Boonstra
/s/ Kirsten Frank Kelly
/s/ Christopher M. Murray